# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6082 | **DATE** | 9/30/2003 |
| **CASE TITLE** | James Deal vs. Jo Anne Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants Plaintiff's motion for summary judgment (14-1), denies Defendant's motion for summary judgment (17-1) and remands this case to the agency for further proceedings.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | | **Document Number** |
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | SEP 30 2003 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | 21 |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 9/30/2003 | | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK C3 SEP 30 PH 4: 23 FILED Date/time received in central Clerk's Office | | date mailed notice | | |
| | | | | ETV mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMES DEAL,                          )
                                     )
        Plaintiff,              )
                                     )
    v.                       )    No. 01 C 6082
                                     )
JO ANNE BARNHART,                    )    Judge Rebecca R. Pallmeyer
Commissioner of Social Security      )
Administration,                      )
                                     )
        Defendant.              )

DOCKETED
SEP 3 0 2003

## MEMORANDUM OPINION AND ORDER

On August 8, 2001, Plaintiff James Deal brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), against Defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration (SSA), challenging the Administrative Law Judge's June 14, 1999 decision denying his claim for Supplemental Security Income (SSI) childhood disability benefits. Plaintiff asserts that the decision of the Administrative Law Judge (ALJ), affirmed by the Commissioner, lacked evidentiary support and employed the wrong legal standard for determining childhood disability. Plaintiff claims he has medically determinable impairments, including a learning disability and oppositional defiant disorder, which limit his ability to function in several areas: cognition and communication; personal functioning; social functioning; and concentration, persistence and pace. Plaintiff asserts that his limitations from his impairments are "marked and severe," rendering him disabled as defined in 42 U.S.C. § 1382c(a)(3)(C)(i).

The parties have filed cross motions for summary judgment. For the reasons stated in this opinion, Defendant's motion is denied, Plaintiff's motion is granted, and the court remands this matter to the SSA for further proceedings.

21

Plaintiff James Deal resides in Chicago, Illinois, with his legal guardian Ann Thomas. (Administrative Record, (hereinafter, "A.R."), at 88-90.) He has filed this action to contest the Defendant's final decision denying his application for SSI childhood Disability Benefits. According to Plaintiff, he has been diagnosed with a learning disability, oppositional defiant disorder, and a conduct disorder. (*Id.* at 393.) Plaintiff argues that these impairments have resulted in marked limitations in several functional areas, including: cognition and communication functioning, social functioning, as well as his concentration, persistence, and pace. (*Id.* at 393.) Defendant Jo Anne Barnhart is the Commissioner of the Social Security Administration, the agency responsible for reviewing Plaintiff's application for benefits and for making the final determination regarding his claim. The Commissioner's final decision denying Plaintiff's application for SSI benefits issued on June 23, 2001. Plaintiff filed his timely appeal on August 8, 2001.[2]

## I.    Procedural History

On April 11, 1997, Ann Thomas, Plaintiff's guardian, filed an application for SSI benefits on behalf of Plaintiff, who was fifteen years old at the time, claiming that he was disabled since birth by a learning disorder, seizures, asthma, and blackouts. (*Id.* 88-90, 94.) Plaintiff later amended his application, however, to reflect a disability onset date that coincided with the date Plaintiff's application was filed. (*Id.* at 399.) This application was denied by the SSA initially and upon reconsideration. (*Id.* at 29-40.) First, in an August 4, 1997 letter from Myrtle Habersham, Regional Commissioner of the SSA, to Thomas, the SSA denied Plaintiff's disability claim because "there

---

[1]    The court notes that the parties do not dispute the facts relevant to this opinion. Instead, the parties dispute whether the evidence supported the ALJ's decision and whether the proper legal standard was applied. The court has compiled the facts for this section directly from the Administrative Record provided by the Defendant.

[2]    This court has proper jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

is no evidence of an impairment which would prevent him from functioning." (*Id.* at 31.)

Subsequently, on August 15, 1997, Thomas appealed the decision on behalf of Plaintiff. (*Id.* at 34.)

In a second letter, dated December 5, 1997, Habersham notified Thomas that his claim was denied

on reconsideration. (*Id.* at 37.) Habersham's letter acknowledged that Plaintiff had a history of a

learning disability, seizures, headaches, back pain, blackouts, fainting, and nose bleeding, but she

observed that these conditions were treatable and that Plaintiff therefore did not meet the definition

of disability under the Social Security Act. (*Id.*)

On January 13, 1998, Plaintiff requested a hearing before an administrative law judge (ALJ)

regarding his claim for SSI disability benefits. (*Id.* at 41.) Administrative Law Judge Robert Asbile

conducted the first of two hearings on November 16, 1998. (*Id.* at 302-88.) At the hearing, Plaintiff

was represented by counsel and the ALJ heard from Plaintiff, Thomas, and two medical experts:

Dr. Harold Goodman and Dr. Benjamin Blackman.[3] (*Id.* at 304-88.) Numerous exhibits regarding

Plaintiff's alleged disability were also supplied to the ALJ. A supplemental hearing was held on

March 3, 1999, with Plaintiff and Thomas present, and the ALJ heard from two additional experts:

Dr. Howard Lee and Dr. William Fischer.[4] (*Id.* at 390-437.)

On June 14, 1999, after considering all the evidence, the ALJ issued his ruling, finding that

Plaintiff was not disabled and therefore not entitled to SSI children's disability benefits. (*Id.* at 19-

28.) In a June 23, 2001 letter to Plaintiff, William Bean, on behalf of the SSA Appeals Council,

denied Plaintiff's request for review, stating that there was no basis in the SSA regulations to grant

---

[3]     Both medical experts at this hearing were called by the ALJ to serve as medical
advisors regarding Plaintiff's claim, but they did not treat Plaintiff. (*Id.* at 60, 63, 305.) Although
the doctors did not state their specialty, according to their resumes, Blackman has a background
in child psychiatry and Goodman has experience in the area of pediatrics. (*Id.* at 61-62, 64-65.)

[4]     At this second hearing, both medical experts were once again called by the ALJ to
serve as medical advisors regarding Plaintiff's claim. (*Id.* at 72, 77.) According to the record,
neither doctor had treated Plaintiff. Dr. Fischer's education and experience is in the area of
psychology and Dr. Lee has a background in pediatrics. (*Id.* at 74-76, 80-83.)

a review. (*Id.* at 7-9.) In this same letter, Bean informed Plaintiff that the ALJ's "decision stands as the final decision of the Commissioner of Social Security in your case." (*Id.* at 7.) Plaintiff filed a timely action in this court seeking judicial review of the SSA's denial of SSI benefits.

## II.    Medical Evidence Regarding Plaintiff's Disability[5]

On May 31, 1994, Plaintiff was administered a "psycho-educational assessment," consisting of a variety of tests, to assess his learning abilities. (*Id.* at 192.)  On IQ tests, Plaintiff scored a verbal IQ of 96, a performance IQ of 86, and a full scale IQ of 90, placing him in a below-average to average ability range. (*Id.* at 192-93.)  The test administrator (whose name is not identified in the record) concluded that Plaintiff had particular weaknesses in general education, cultural knowledge, long term memory, short term verbal memory, attention span, ability to construct an abstract design from its parts, and ability to visualize and construct an object from its parts. (*Id.*) The evaluator also noted, without elaboration or any specifics, that Plaintiff was "experiencing significant coping difficulties." (*Id.*)  The evaluator added that Plaintiff has "Learning Disability Syndrome" and should attend the learning support program at his school. (*Id.* at 194.)

On June 20, 1997, Plaintiff underwent a 31-minute internal medicine evaluation given by Dr. George Bridgeforth.[6] (*Id.* at 202-204.)  Bridgeforth did not have any of Plaintiff's past medical records and based his findings solely on his own evaluation. (*Id.* at 202.)  In his evaluation, Bridgeforth noted that Plaintiff complained that he experienced difficulty breathing when engaged in sports activities and sometimes feels as if he is going to choke. (*Id.*)  Plaintiff also complained of severe headaches, occasionally accompanied by nausea, that do not respond to Tylenol. (*Id.*) Bridgeforth diagnosed Plaintiff with mild asthma and ruled out atypical migraine headaches. (*Id.*)

---

[5]    The following information was compiled from certain exhibits included in the Administrative Record.

[6]    According to the record, Bridgeforth is affiliated with the Lake Shore Medical Clinic in Chicago, but the record does indicate his area of specialty. (*Id.* at 202.)

On the same day, Plaintiff underwent a psychiatric examination. (*Id.* at 207-209.) The psychiatrist who examined him, Dr. Rama Embar, noted that Plaintiff was appropriately dressed and cooperative during the evaluation, that his mood was neither depressed or manic, and that his affect and esteem were normal. (*Id.* at 207.) Plaintiff demonstrated no evidence of preoccupations, obsessions, phobia, or delusions. (*Id.* at 208.) Plaintiff informed Embar that he smoked a few cigarettes a day, that he occasionally smokes marijuana, and that he drinks wine occasionally as well. Embar's diagnostic notes state: (1) "rule out depressive disorder"; (2) "rule out ethanol and drug abuse"; and (3) "past history of abuse and neglect."[7] (*Id.* at 209.) Embar also stated that Plaintiff suffers from "behavioral problems," such as being quick to anger and having problems with law enforcement. (*Id.*)

In July 1997, Dr. Carl Hermsmeyer and Dr. Virgilio Pilapi completed a "Childhood Disability Evaluation Form" for Plaintiff, in which they evaluated the evidence regarding Plaintiff's asthma and learning disorder.[8] (*Id.* at 210.) The doctors concluded that Plaintiff's impairments were severe, but that the impairments did not meet, medically equal, or functionally equal the severity of a listing for the purposes of disability benefits. (*Id.* at 210.) They determined that Plaintiff exhibited no evidence of any limitation in the functional areas of: (1) cognitive/communicative; (2) motor; (3) personal; (4) concentration, persistence, or pace. (*Id.* at 211.) They did note that Plaintiff had some limitation in the social functioning area, but concluded that this limitation was less than marked. (*Id.* at 211.) The doctors explained that Plaintiff demonstrated no physical problems, attended classes regularly, and tested at expected grade levels. (*Id.* at 213.)

On September 27, 1997, Dr. Sheng Wu, Plaintiff's pediatrician, completed an "Epilepsy

---

[7]     The court presumes "ethanol" abuse relates to Plaintiff's use of alcohol.

[8]     The record does not indicate the doctors' areas of specialty. (*Id.* at 210.) Nor is the court able to determine which doctor made each conclusion on the form. (*Id.*) For the purposes of this opinion, the court will presume that both doctors participated in each aspect of the evaluation.

5

Report," noting that Plaintiff had been diagnosed with Epilepsy, evidenced by an abnormal electroencephalogram (EEG) that revealed "[right] temporal parietal slow activity. " (*Id.* at 214.) He noted, further, that Plaintiff took Dilantin to control his seizures and that Plaintiff suffered severe headaches as a result of the seizures. (*Id.*)

On September 30, 1997, Dr. John Shermulis (presumably an ophthalmologist) completed an "Ophthalmological Report" in which he noted that in September 1995, Plaintiff had been hit with a brick in his right eye. (*Id.* at 217.) Plaintiff's left eye, according to Shermulis, was compensating for the visual field defects in his right eye. (*Id.* at 217-18.)

In November 1997, Dr. Man Mohan Singh, Dr. Edward Faranco, and Bronwyn Rains completed a "Childhood Disability Evaluation Form" regarding Plaintiff.[9] (*Id.* at 220.) Although they noted that Plaintiff had an established seizure disorder, asthma, and a learning disability, they concluded that these impairments did not meet, medically equal, or functionally equal the severity of a listing for the purposes of SSI benefits. (*Id.*) They did find, however, that Plaintiff had a marked limitation in the area of concentration, persistence, or pace. (*Id.* at 222.) They noted that Plaintiff's impairment was less than marked in the functional areas of: (1) cognitive/communicative; (2) motor; (3) social; and (4) personal. (*Id.*) Although this evaluation supports Plaintiff's argument that he suffers from a marked impairment in the area of concentration, persistence and pace, it was not discussed by the ALJ in his decision to deny Plaintiff benefits.

On March 10, 1998 and March 17, 1998, Plaintiff underwent a "Neuropsychological Evaluation" at the University of Chicago. (*Id.* at 226.) Dr. Helene Yurk, assistant professor of clinical psychiatry and director of pediatric neuropsychology at the University of Chicago, performed this evaluation and noted that Plaintiff was friendly, polite, well-groomed, oriented in all spheres,

---

[9]     On the form, Rains indicated he specializes in the area of psychology. (*Id.* at 220.) Doctors Singh and Faranco did not indicate a specialty on the form, but they are both medical doctors. (*Id.*)

and exhibited no evidence of a thought disorder. (*Id.* at 228.) IQ testing demonstrated that Plaintiff was in the average range of intellectual functioning with IQ scores ranging from below average to average. (*Id.*) Plaintiff exhibited more difficulty in the area of written language; his knowledge of punctuation, capitalization, spelling, and word usage scored at a third grade level (Plaintiff was sixteen years old at the time). (*Id.* at 230.) His expressive writing ability scored at a sixth grade level, leaving his overall expressive writing skills in the borderline impaired range. (*Id.*) Yurk determined that Plaintiff's overall level of intellectual functioning scored within the average range and that his profile was consistent with a learning disorder in reading and written language. (*Id.* at 233.)

According to Yurk, Plaintiff's attention skills were varied throughout the evaluation. (*Id.* at 231.) Plaintiff's results on the Continuous Performance Test were consistent for a person with poor sustained attention and a mildly impulsive response style. (*Id.*) Yurk noted, further, that Plaintiff exhibited "significant difficulty with tasks of sustained attention. Furthermore, [Plaintiff's] response style was uneven and inconsistent during more lengthy tasks." (*Id.* at 231.) Yurk concluded that Plaintiff "demonstrated significant attentional problems, a high level of impulsivity, and poor organizational skills, which interfered with his optimal performance on the above test measure." (*Id.* at 233.) Based on these findings, Yurk observed that Plaintiff would benefit from "a small class size, a quiet environment, sitting away from distractions (i.e. close friends, high traffic areas), sitting in the front close to the teacher, brief assignments with concise instructions, and frequent performance feedback from the teacher." (*Id.* at 235.)

On May 13, 1998, Plaintiff was admitted to Hartgrove Hospital after he was discovered walking outdoors with blood (not his own) on his arms and chest.[10] (*Id.* at 237.) According to the

---

[10]     The record does not provide much detail regarding this incident. In fact, the hospital records, which provide the most information about the incident, state only that "[Plaintiff] has been extremely violent. He was found walking around the street with blood on his arms and chest. He
(continued...)

"Discharge Summary" prepared by Hartgrove Hospital, on the night of the incident, Plaintiff "had been extremely violent," but he did not remember how he became bloody. (*Id.*) A blood test revealed the presence of cannabis in Plaintiff's system. (*Id.* at 237-38.) He remained a patient at the hospital until his release on June 1, 1998, at which time, the attending psychiatrist, Dr. Krawczyk, provided a discharge diagnosis of "personality change due to medical condition." (*Id.* at 237.)

While at Hartgrove Hospital, Plaintiff also underwent a neuropsychological evaluation administered by Dr. Terry Finn, a psychologist. (*Id.* at 241-45.) Finn described Plaintiff's problem-solving style as "impulsive, distractable, as well as inattentive." (*Id.*) He demonstrated "social maladjustment" in regard to his family, school and community milieu and "antisocial tendencies to support his drug habit."[11] (*Id.* at 242.) Dr. Finn found Plaintiff got along well with his own peer group, but was defiant with authority figures. (*Id.*)

Intelligence testing conducted by Finn revealed, as before, that Plaintiff functioned in the average to low average range. (*Id.* at 243.) In the area of short term memory and attention span functioning, however, Plaintiff demonstrated significant attention deficit disorder in both auditory as well as visual attention processing for new learning. (*Id.* at 243.) Plaintiff gave up on tasks quite easily and thus, Finn found, Plaintiff was unable to sustain the necessary attention required for school learning. (*Id.*) On the Beery Buktenica Visual Motor Integration Test, Plaintiff demonstrated profound visual sequential attention span processing lags. (*Id.* at 244.) In addition, Plaintiff demonstrated a severe listening attention span deficit on the Speech-Sound Perception Test. (*Id.*)

---

[10](...continued)
did not know how he became so bloody." (*Id.* at 237.) It is unclear from the record where Plaintiff was found walking the streets or who found him. The court presumes, however, that the blood on Plaintiff's body was not his own because there is no evidence in the record of Plaintiff receiving medical attention, while at the hospital, in connection with any physical injuries.

[11]     The record does not reflect what behavior on Plaintiff's part demonstrated this social maladjustment, nor did Dr. Finn present any examples of Plaintiff's "antisocial tendencies."

Finn recommended that Plaintiff continue with reasonable accommodations in school as a result of his learning disabilities and attention deficient disorder.[12] (*Id.* at 244.) Finn's conclusion that Plaintiff suffered from ADD was not addressed in the ALJ's decision denying Plaintiff benefits, instead the ALJ relied on the testimony of Fischer, who stated that there was no evidence that Plaintiff suffered from attention deficit hyperactivity disorder.

## III.    Academic Records

On March 30, 1997, while Plaintiff was attending eighth grade at Whistler Elementary School in Chicago, an administrator or teacher completed an Individualized Education Program form (IEP pertaining to Plaintiff.[13] (*Id.* at 197.) The IEP indicated that Plaintiff had taken a "Wide Range Achievement Test" on March 27, 1997 and had scored at the fifth grade reading level, the fourth grade spelling level, the seventh grade math level, and the fifth grade comprehension level. (*Id.*)

In May 1997, Plaintiff, then aged 15, was completing the eighth grade at Whistler. Catherine Woodall, one of his teachers, completed a "School Activities Questionnaire" in which she indicated that she had known Plaintiff for one school year and that she spent 200 minutes with him each week. (*Id.* at 199-201.) According to Woodall, Plaintiff's "ITBS" scores demonstrated that he was functioning between a seventh and eighth grade level.[14] (*Id.*) She noted, further, that she had not observed any problems with Plaintiff's interaction with other students in class or with his attention span, concentration, or on-task behavior in class; that he was able to work independently;

---

[12]    Although Finn does not explain what reasonable accommodations should be continued, the court presumes that Finn was referring to the special education measures taken by Plaintiff's school, discussed in more detail below. Finn did not provide any specific examples of reasonable accommodations that were warranted in Plaintiff's case.

[13]    The court can not decipher the name of the school administrator or teacher that completed this form.

[14]    The Administrative Record does not provide the full name of the "ITBS" test, but the court presumes that it is a standardized test used to evaluate the development of students.

that he understood and completed assignments on time; that he was not troubled by changes in routine; and that he did not exhibit any unusual or bizarre behavior. (*Id.* at 199.) She also recorded that Plaintiff got along well with his peers and teachers; he did not miss classes; he was able to keep up with his peers in sports and games; he did not exhibit any hygiene problems; he did not exhibit any physical impairment; and she had not observed any worsening in Plaintiff's behavior. (*Id.* at 200.) To the contrary, Woodall characterized Plaintiff as "a very mature young man." (*Id.* at 201.)

On May 27, 1998, Fenger High School, the school Plaintiff was attending at the time, completed an IEP for Plaintiff.[15] (*Id.* at 176-81.) This evaluation was completed while Plaintiff, then a ninth grader, was hospitalized at Hartgrove from May 13 to June 1, 1998, and was based in part on a standardized test administered on March 11, 1998. (*Id.* at 176.) Plaintiff scored at an eighth grade level for reading, a seventh grade level for math and a sixth grade level for spelling on that test. (*Id.* at 176.) At the time the IEP was completed, Plaintiff's grade point average at Fenger was a 1.2857, and his class rank was 252 out of 595 students.[16] (*Id.*) The report noted that Plaintiff exhibited deficits in visual discrimination and in perception. (*Id.*) The report also indicated concerns regarding Plaintiff's mental health, resulting from the multiple moves he experienced after his mother's death in 1995. (*Id.*) The report did note, however, that Plaintiff "[g]ets along well with his peers." and that he did not need an extended school year to maintain his then-current level of information, skills, and behavior. (*Id.* at 179.)

---

[15]    The court is unable to decipher the name of the person that completed this form.

[16]    As remarkable as it might seem, according to the May 1998 IEP, Plaintiff's grade point average of 1.2857 placed him in the top half of his class.

## IV.    Hearings Conducted by ALJ

### A.    Plaintiff's Testimony

On November 16, 1998, the date of the first of two hearings regarding Plaintiff's application for SSI benefits, Plaintiff was sixteen years old. (*Id.* at 309.) For the previous two years, Plaintiff reported, he had been living with his guardian Ann Thomas and his sister Maria Dorsey.[17] (*Id.* at 309, 311-12.) He explained that he had moved in with Thomas soon after his mother died of AIDS in 1995. (*Id.* at 310.) Prior to living with Thomas, Plaintiff had primarily lived with his mother, but she frequently moved him from place to place, leaving him with various friends and family members for extended periods of time. (*Id.* at 309-11.) Plaintiff testified that he got along with Thomas, but acknowledged that his own poor behavior caused problems for her. (*Id.* at 312.) Specifically, Plaintiff testified that he upset Thomas by punching holes in her walls, staying out all night, getting into an accident in her car, smoking marijuana, and being disruptive at school. (*Id.*)

At the time he testified at the first hearing, Plaintiff was attending ninth grade at Sullivan High School. (*Id.* at 313.) He stated that he was not doing well academically at Sullivan and that he was receiving Ds and Fs. (*Id.*) As part of his academic curriculum at Sullivan, Plaintiff was required to attend a "resource class" for 50 minutes each school day, designed to provide him with increased attention and instruction. (*Id.* at 313-14.) For the remainder of his school day, Plaintiff attends mainstream courses. (*Id.* at 314.)

In addition, Plaintiff explained that he experienced academic problems prior to attending Sullivan High School. He had been held back once in the sixth grade and again in the ninth grade. (*Id.* at 313-14.) In the previous year alone, before starting at Sullivan, Plaintiff had attended two different high schools, beginning the academic year in September 1997 at Percy Julian High School

---

[17]    Thomas testified at the first hearing that Plaintiff moved in with her on September 1, 1996. (*Id.* at 346.)

and finishing it at Fenger High School. (*Id.* at 315.) According to Plaintiff, he was forced to leave these schools for a variety of reasons, including fighting and "gang-banging." (*Id.* at 315.) Prior to expulsion from Julian High School, Plaintiff had been suspended twice, once for arguing with another student and a second time for fighting with a student. (*Id.* at 316-17.) Plaintiff has also been arrested twice: once in October 1999 for vandalism and once earlier in Michigan for drug possession.[18] (*Id.* at 322-23.)

Plaintiff testified that he has difficulty completing his homework for school because he gets frustrated within ten minutes and gives up. (*Id.* at 314.) He does not ask Thomas for help with his homework because he believes that she is too busy with other things. (*Id.*) Plaintiff testified that he is able to read, but that he is easily distracted, and will start reading but almost immediately find an excuse to stop. (*Id.* at 336, 358.) Plaintiff testified again at the March 1999 hearing to provide the ALJ with an update regarding his condition. At this supplemental hearing, Plaintiff explained that he no longer attended Sullivan High School and instead, attends a GED program at Olive Harvey College. (*Id.* at 394.) He left Sullivan because his grades were very poor and he anticipated being asked to leave. (*Id.* at 395.)

Plaintiff testified, further, that in the previous year, he had resumed weekly meetings with a therapist, Lee Madden, at the University of Chicago. (*Id.* at 395-96.) He had some sessions with Madden at some earlier point, but had stopped meeting with her because "she made [him] mad all the time." (*Id.* at 396.) Plaintiff explained that he starting meeting with Madden again because he began hearing voices, not only when he was in trouble of some kind but also when he is sitting quietly. (*Id.*)

Plaintiff also complains of severe headaches and stomach pain, which he explained prevent

---

[18]     Although the Administrative Record does not reflect the date of this arrest or the surrounding circumstances, the court presumes that this arrest took place before or soon after his mother's death, while Plaintiff was living in Michigan.

him from functioning. (*Id.*) A doctor Plaintiff consulted about his headaches (not identified in the record) was unable to diagnosis the problem.[19] (*Id.* at 413.) He takes Tylenol for his headaches and "Deprakote" to control his seizures.[20] (*Id.* at 326.) He testified that his last seizure was a week before the hearing, and the previous seizure was three months before the hearing. (*Id.* at 326.) He denies having problems with asthma. (*Id.* at 337, 339.) Although he could not recall the exact date, Plaintiff recalled being shot in both thighs when he lived with his mother. (*Id.* at 414.)

### B.    Testimony of Ann Thomas

Thomas provided only limited testimony at the November 1998 hearing, but stated that Plaintiff suffers from a short attention span and experiences difficulty concentrating. (A.R. at 355.) Thomas testified that Plaintiff has a problem with authority, he does not like to take orders from people, and, according to reports from his teachers, does not apply himself at school. (*Id.* at 358.)

Thomas provided additional testimony at the March 1999 hearing. At this hearing, Plaintiff explained that Plaintiff had been living with her since 1996, a year after his mother died. (*Id.* at 402.) According to Thomas, Plaintiff's mother did not take good care of him. (*Id.*) Thomas believes that Plaintiff's problems are the result of his mother's drug use during her pregnancy. (*Id.*) For the year following his mother's death in 1995, Plaintiff lived in Michigan and, according to Thomas, was "running the streets doing whatever, getting into trouble." (*Id.* at 403–404.) Thomas added that the woman Plaintiff stayed with in Michigan was an unfit parent. (*Id.* at 404.)

At some point in 1995, Plaintiff's older brother brought him back to Chicago.[21] (*Id.*) While

---

[19]    Plaintiff was not certain of the doctor's name. (*Id.*)

[20]    The court presumes this is a reference to Depakote, the trade name for Valproic acid, which is used to treat seizures and migraine headaches. *See* http://www.safemedication.com/results.

[21]    The Administrative Record does not reflect the date of this move, nor the name of Plaintiff's older brother.

Plaintiff was living in Chicago, Plaintiff's grandmother attempted to place him in DCFS custody, but Plaintiff's older brother interceded and placed Plaintiff in the care of a family friend named Gastin. (*Id.*) After learning that Gastin sexually abused Plaintiff, his grandmother contacted Thomas, who agreed to take Plaintiff, then aged fourteen, into her home. Plaintiff attended Whistler Elementary School and was placed in a special education program there because school records showed he had been enrolled in a special education program in Michigan to address a learning disability. (*Id.* at 405.)

According to Thomas, Plaintiff had a great deal of trouble with reading, writing, spelling, math, and social studies. (*Id.* at 405-406.) She testified that nothing in school holds Plaintiff's attention and that his interests are limited to watching television, listening to music, and singing. (*Id.* at 406.)

Since graduating from Whistler, Thomas testified, Plaintiff attended four different high schools. (*Id.*) He started at Percy High School, which he attended for a few months, but was forced to leave because he was involved in gang activity and had poor grades. (*Id.* at 407.) Plaintiff was also concerned that he was going to get beat up at Percy. (*Id.*) While he attended Percy he was receiving special education courses. After leaving Percy, Plaintiff attended Fenger High School, until March or May of 1998. (*Id.*) Plaintiff stopped attending Fenger, according to Thomas, because he was getting into trouble at school and because he ran away from home. (*Id.*)

Plaintiff was away from home for an undetermined period of time. When he returned, he was found – the record does not explain precisely where, or by whom – walking outdoors with blood on his body. (*Id.* at 408.) Thomas testified that after consulting with Dr. Madden, Plaintiff's counselor from the University of Chicago, Thomas had Plaintiff admitted to Hartgrove Hospital in

May 1998.[22] (*Id.*)  As noted earlier, Plaintiff remained hospitalized for approximately two to three weeks. (*Id.*)  He was discharged in June 1998 and returned to Thomas's home, starting school in the fall at Sullivan High School, on the north side of Chicago, where Thomas sent him to help keep him out of trouble. (*Id.* at 409.)  Plaintiff did stay out of trouble, according to Thomas, but was unable to do the school work, was failing a number of classes, and was not getting any special educational help. (*Id.*)

He remained at Sullivan from September until December. (*Id.*)  When Thomas realized that Plaintiff was going to be "kicked out" of Sullivan, she placed him in a GED program at Olive Harvey.[23] (*Id.* at 410.)  At the time of the March 1998 hearing, Plaintiff was still attending the GED program. (*Id.* at 411.)  Thomas explained that the GED program does not use grades, so she is unable to determine how Plaintiff is performing in that program. (*Id.*)

Thomas explained that Plaintiff suffers from a number of physical impairments. She testified that Plaintiff has experienced a number of head traumas. (*Id.*)  He was hit in the head with a brick when he was six or seven years old. (*Id.* at 411.)  At an undetermined age, he injured himself when he hit his head against the end of a table. (*Id.*)  The most severe head injury resulted from a car accident in which a ice scraper pierced Plaintiff's skull.[24] (*Id.* at 411-12.)  Thomas explained, further, that Plaintiff suffers from seizures. She did not recall the date of his last seizure, but did remember taking him to a doctor who prescribed medication that helped control the

---

[22]    Thomas did not explain why she needed Madden's advice to take Plaintiff, who clearly needed medical attention, to the hospital.

[23]    Thomas did not explain why Plaintiff was going to be "kicked out" of Sullivan High School.

[24]    The record does not indicate when this head trauma took place.  In addition, the court notes that the record is also unclear regarding what instrument actually pierced Plaintiff's skull.  Thomas stated that it was an ice scraper, but other evidence in the record indicates it might have been an ice cream scoop or a piece of metal. (*Id.* at 21, 237.)

seizures. (*Id.* at 353.) In addition, Thomas testified that there are episodes in which Plaintiff stares into space and does not respond when called.[25] (*Id.* at 353-54.)

### C. Testimony of Dr. Harold Goodman

Dr. Harold Goodman, a pediatrician, offered his expert opinion regarding Plaintiff's physical impairments and his view regarding the severity of Plaintiff's condition. (*Id.* at 359.) He limited his opinions to Plaintiff's physical impairments because Dr. Blackman was also present at the November 1998 hearing to offer an opinion regarding Plaintiff's mental impairments. (*Id.*) In Dr. Goodman's opinion, even when all Plaintiff's physical impairments are considered together, the impact on his motor functioning is still less than marked. (*Id.* at 361.)

Goodman testified that there was some evidence in Plaintiff's medical records that he suffered from a "very mild wheeze," but Goodman determined that the asthma did not cause him "great difficulty" and does not approach the severity of a listed impairment under the Social Security Act. (*Id.* at 359.) Regarding Plaintiff's seizures, Goodman testified that because Plaintiff has fewer than one seizure per month, he does not meet the test set forth in the listing, 20 C.F.R Part 404, Subpt. P. App. 1 § 11.02, which requires a showing that the individual suffers more than one major motor seizure per month, despite at least three months of prescribed treatment. (*Id.* at 360.) In addition, the nocturnal seizures Plaintiff experiences do not interfere with activity the next day, as required by the applicable listing.[26] (*Id.* at 361.) Goodman added that the seizures do not interfere with communication and that he had discovered no evidence of significant adverse affects from any medication. (*Id.* at 361.) Dr. Goodman acknowledged that the episodes of vacant staring are

---

[25]    Thomas did not describe the frequency of these episodes.

[26]    Although Goodman testified regarding the severity of Plaintiff's nocturnal seizures here, the court has not discovered a medical record discussing these nocturnal seizures, nor did Plaintiff complain about this condition during his testimony.

puzzling; they might be a symptom of a psychiatric problem, but might also be a variance of a major motor seizure. (*Id.* at 360) These episodes do not meet the required listing, however, according to Goodman, because the listing requires convulsive movements. (*Id.*) Accordingly, he opined that Plaintiff's physical impairments do not rise to the level of a disability for the purposes of the Social Security Act.

### D.    Testimony of Dr. Benjamin Blackman

Dr. Blackman, a psychiatrist, provided expert testimony concerning Plaintiff's mental impairments. (*Id.* at 362.) Blackman testified that Plaintiff has a learning disability disorder and a conduct disorder. (*Id.*) He went on to state that Plaintiff has IQ scores in the low average range, but that his achievement in school is below what would be expected of someone with Plaintiff's IQ. (*Id.*)

Blackman testified that he had difficulty assessing the severity of Plaintiff's impairments because the record is grossly inconsistent. (*Id.*) He noted that in 1997 Plaintiff was described by a teacher as "a mature young man," but only one year later he was admitted to Hartgrove in May 1998 for acting out and drug use. (*Id.* at 363.) He noted that these are extreme inconsistencies. (*Id.*) Noting further inconsistences in Plaintiff's academic records, Blackman noted that some of Plaintiff's testing results are within the average range and others describe "a great deal of concentration problems and attention problems and attitude problems, behavioral problems." (*Id.* at 364.) Nevertheless, based on the evidence he reviewed, Blackman opined that Plaintiff did not have any marked limitations in any of the functional areas. (*Id.*) He explained that he arrived at his opinion because Plaintiff "is capable of relating in a reasonable and pleasant manner." (*Id.* at 365.) He also noted the good demeanor that Plaintiff presented at the neuropsychological evaluation conducted by Lee Madden in March 1998. (*Id.* at 228, 365.) Even though Plaintiff became fidgety at more challenging tasks during the evaluation, Blackman noted that Plaintiff was

motivated and cooperative throughout the evaluation. (*Id.*) According to Blackman, Plaintiff's behavior at the evaluation, as reported by Madden, demonstrates that he has the capacity to relate appropriately. (*Id.*)

Blackman then rated Plaintiff on the functional guides based on his impairments. (*Id.* at 366.) He explained that Plaintiff's impairment is less than marked in his cognitive functioning; motor functioning; social functioning; personal behavior; and concentration, persistence and pace. (*Id.*) In Dr. Blackman's view, however, Plaintiff suffers from a learning disability. (*Id.*) Blackman explained that learning disabilities fall into three groups – reading, mathematics, and expressive language. (*Id.*) Dr. Blackman testified that Plaintiff has all three types of learning disabilities, but that the real problem with his academics is that "he doesn't really try." (*Id.*) In other words, Blackman explained that tasks are difficult for Plaintiff, but if he tried harder, he would have better results. (*Id.* at 366-67.)

Blackman did acknowledge that Plaintiff's frustration with homework means "that he may not be able to achieve according to his actual intellectual ability." (*Id.* at 367.) He also noted that his learning disability could *affect* his self-esteem and the way he gets along with classmates, but the doctor was unwilling to agree with Plaintiff's attorney that Plaintiff's difficulty interacting with peers is the *result* of his learning disability.[27] (*Id.* at 368.) Blackman also acknowledged that Plaintiff has a conduct disorder, as evidenced by his defiant attitude, his difficulty with teachers and other authority figures, and his abuse of alcohol and drugs. (*Id.* at 368-70.) Dr. Blackman noted that the neglect and sexual abuse that Plaintiff suffered as a child could contribute to a conduct disorder. (*Id.* at 371.)

Blackman concluded that Plaintiff's impairments were less than marked in his cognitive and communication functioning. (*Id.*) In making this finding, Blackman relied on Plaintiff's IQ scores,

---

[27]    Blackman did not describe Plaintiff's learning disability in any further detail.

which demonstrate an average or low average intelligence. (*Id.* at 371-72.) Blackman acknowledged that Plaintiff, who was testing at the fifth grade level for reading and spelling at age sixteen, was not functioning at his IQ level, but opined that Plaintiff could score higher on these tests if he tried. (*Id.* at 372-73.) Plaintiff's motivational problems, according to Blackman, are demonstrated by his approach to homework: he works for ten minutes before giving up. (*Id.*)

Blackman found that Plaintiff's impairment was less than marked in social functioning. (*Id.* at 381.) His opinion was based on Plaintiff's behavior at the hearing itself, the IEPs and the observations of his teacher at Whistler Elementary School. (*Id.*) Blackman did acknowledge, however, that Plaintiff's social functioning might diminish when he gets frustrated. (*Id.* at 382.)

Finally, Dr. Blackman also found that Plaintiff does not suffer from a marked impairment in the functional area of concentration, persistence or pace, a conclusion that was also largely based on Plaintiff's performance at the hearing. (*Id.* at 384.) According to Blackman, Plaintiff "showed adequate ability to concentrate and persist and answer [his attorney's] questions this entire morning." (*Id.*) Although Blackman recognized that Plaintiff is quick to give up on difficult tasks, he did not believe that this means Plaintiff lacks the attention span for school learning. (*Id.* at 385.)

### E.    Testimony of Dr. Howard Lee

Dr. Lee, a pediatrician, provided expert testimony regarding Plaintiff's impairments. Lee testified that he has not seen any evidence indicating that Plaintiff has a learning disability. (*Id.* at 400.) Instead, Lee explained, "[Plaintiff] does what he wants to do at the time he wants to do it, according to the report. He doesn't go to school and he doesn't do his homework."[28] (*Id.*)  Lee testified that Plaintiff did not meet, equal, or functionally equal any listed impairment. (*Id.* at 417.)

---

[28]    The record is unclear regarding which report Lee was referring to when he made this statement. (*Id.* at 400.)

**F.     Testimony of Dr. William G. Fischer**

According to Fischer, a psychologist who provided expert testimony at the hearing, the file compiled on Plaintiff documents that he has a severe mental impairment. (*Id.* at 419.) He stated that the impairment lies in the area of social functioning, which, according to Fischer, resulted from the multiple problems he experienced during the early years of his upbringing. (*Id.* at 419-20.) Fischer did not find any cognitive problems with Plaintiff, noting that Plaintiff's test results reflect a person with average intelligence. (*Id.* at 420.) He concluded that Plaintiff does not have a learning disability, but that Plaintiff has been underachieving, which is connected to his problems in the area of social functioning. (*Id.*) He also noted that Plaintiff's tests scores have been improving and his special class time is limited to approximately 250 minutes a week in a standard 1500 minute week. (*Id.*)

Fischer referred briefly to the episode in which Plaintiff was admitted to Hartgrove Hospital after being found wandering the streets with blood on his body. (*Id.*) Dr. Fischer noted that Plaintiff was diagnosed at the hospital by a psychiatrist, Dr. Krawczyk, as having a personality change secondary to a medical condition, which, according to Fischer, refers to the organic brain invasions that he had throughout the years by blunt instrument (the court presumes this is a reference to the multiple head traumas Plaintiff has experienced). (*Id.*) At the hospital, Plaintiff received a prescription for Depakote, which had positive effects on this seizure disorder. (*Id.* at 420-21.) He was also put on Lithium, which reduced his violent tendencies.[29] (*Id.* at 421.) Fischer noted, however, on admission to the hospital, Plaintiff tested positive for drugs and observed that Plaintiff's social problems can be exacerbated by his substance abuse. (*Id.*)

---

[29]     Fischer did not explain how he knew that Plaintiff was treated with Lithium, nor did he refer to a specific exhibit when making this statement.

Based on his findings, Fischer does not believe that Plaintiff's mental impairment or combination of mental impairments meet or equals any of the listings. (*Id.*) He found that Plaintiff has a less than marked impairment in cognitive ability. (*Id.*) He found that Plaintiff was markedly limited in his social functioning, but has less than marked impairment in the personal area of functioning. (*Id.*) Although Fischer recognized that Plaintiff puts himself in high risk situations, he also noted that Plaintiff is capable of taking care of himself and completing chores. (*Id.*) Thus, his overall adaptative skills are within normal limits. (*Id.*)

Regarding the functional area of concentration, persistence and pace, Fischer stated that Plaintiff has demonstrated problems because he has been under-achieving. (*Id.* at 422.) Fischer believed that most of his problems were in the area of persistence. (*Id.*) He noted that Plaintiff's results on timed IQ tests demonstrate that he is able to concentrate and that pace is not a problem. (*Id.*) Fischer testified that Plaintiff's persistence is

> variable and that relates to his lack of application of his abilities to what he wants to learn. It relates to his impulsiveness, a history of that related to his emotional problems. But there has been no diagnosis of attention deficit disorder or attention deficit hyperactivity disorder. He's not been described anywhere in the file that I can find of having severe problems in this area.

(*Id.* at 422-23.) He added that Plaintiff's attention span is in the low-average range. (*Id.* at 429.) Fischer explained that if Plaintiff were suffering from marked impairments that resulted in distractability and inattention, he would likely have been diagnosed with ADHD or ADD; instead he has been diagnosed as no worse than low-average in terms of attention and concentration. (*Id.* at 429.) Fischer opined that Plaintiff's impairment is less than marked in the functional area of concentration, persistence and pace. (*Id.* at 423.)

Overall, Fischer stated, Plaintiff has a problem primarily with social functioning, potentially as a result of a combination of his oppositional defiant disorder, conduct disorder, and behavior disorder. (*Id.* at 430.) He noted, however, that Plaintiff has not been placed in emotional or

behavioral disorder classes at school. (*Id.*) Despite Plaintiff's problems in the area of social functioning, Fischer found that Plaintiff did not meet the disability standard necessary to receive SSI benefits. (*Id.*)

## V.    The Administrative Law Judge's Decision

On June 14, 1999, after considering all of the evidence and applying the then-applicable standard for assessing childhood disability, the ALJ found that Plaintiff was not disabled for the purposes of the Social Security Act. (*Id.* at 21.) Based on the expert testimony provided regarding Plaintiff's physical impairments, the ALJ determined that Plaintiff does not have a severe physical impairment. (*Id.* at 26.) The ALJ pointed out the evidence demonstrating that Plaintiff's seizure disorder is "well controlled with medication" and that Plaintiff has not recently experienced a seizure. (*Id.*) The ALJ noted, further, that Plaintiff has fully recovered from his various head injuries and does not continue to suffer asthmatic attacks. (*Id.*)

The ALJ addressed Plaintiff's mental impairments with more precision. The ALJ determined, first, that Plaintiff has not taken part in any gainful activity. The ALJ, next, relied on the testimony of Dr. Blackman and Dr. Fischer in finding that Plaintiff suffered from a severe mental impairment, and thus met the second step of the test. (*Id.*)

In addressing the third and final step, the ALJ noted that Dr. Blackman testified that Plaintiff could function adequately in school and that his lack of motivation factored into Plaintiff's poor academic performance. (*Id.*) The ALJ then noted that Dr. Fischer found that Plaintiff had a marked impairment in social functioning, but that his impairments in cognitive functioning, personal functioning, and concentration, persistence and pace were all less than marked. (*Id.*) The ALJ also noted that Dr. Fischer found that claimant's academic performance was "less than desirable," but was not to a level that the SSA recognized as markedly impaired. (*Id.*) Dr. Fischer and Dr. Blackman agreed that Plaintiff did not meet, equal or functionally equal the level of severity

contemplated by the listed impairments.

The ALJ agreed with the findings made by Fischer and Blackman and determined that Plaintiff was not disabled. (*Id.* at 27.) The ALJ noted that there are some limitations on Plaintiff's cognitive functions, but that he is able to do school work. (*Id.*) He noted, further, that Plaintiff has demonstrated some impairment with personal functions, in the form of poor judgment, but he does not have a marked impairment as demonstrated by the fact that Plaintiff is able to groom himself and function independently. (*Id.*) The ALJ then addressed Plaintiff's functionality with respect to concentration, persistence and pace. Specifically, the ALJ stated: "[Plaintiff] has a problem with impulsivity; however, according to Dr. Fischer, there is no evidence of attention deficit hyperactivity disorder ('ADHD'). Therefore, his concentration, persistence and pace are less than markedly impaired." (*Id.*) Based on these findings, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets, equals or functionally equals the listed impairments. Although the ALJ determined that Plaintiff did have a marked limitation in the area of social functioning, (*id.* at 27), she concluded that Plaintiff "does not have an impairment or combination of impairments listed in, or medically or functionally equal to one listed in, Appendix 1 to Subpart P, Regulations No. 4. Accordingly, the ALJ determined that Plaintiff is not disabled under the Social Security Act. Subsequently, on June 23, 2001, Plaintiff was informed that the SSA Appeals Council had denied his request to review the ALJ's decision and that the ALJ's decision would serve as the final decision for the Commissioner of Social Security.

## VI. Disability Standard

The court notes that there is a dispute between the parties regarding the proper disability standard applicable to Plaintiff's claim for SSI benefits. Defendant argues that the court should apply the disability standard that was in place at the time the ALJ made his decision on June 14, 1999. Plaintiff argues, however, that the court should apply the new childhood disability regulations

23

that became effective on January 2, 2001. Plaintiff's legal basis for making this argument hinges on the fact that Plaintiff's disability claim was still pending before the SSA's Appeals Council when the new rules became effective. As a result, the decision regarding Plaintiff's application was not final, Plaintiff argues, and the new rules should apply. Defendant, on the other hand, argues that the Appeals Council refused to review Plaintiff's claim and therefore the final decision was issued on June 14, 1999, well before the new regulations became effective.

The court notes that the two standards are not drastically different from one another. Both sides agree that under the Social Security Act:

> [a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). Both sides agree, further, that both standards require a three-step process to determine whether a child has a disability. 20 C.F.R. § 416.924(a). A child must meet all three steps in order for the SSA to find him or her disabled for the purpose of the Social Security Act. The first step is whether the child engages in substantial gainful activity. 20 C.F.R. § 416.924(b). If she does, she is not disabled. (*Id.*) Next, the SSA must determine whether a child's impairments are severe, meaning that her impairments cause more than minimal functional limitations. 20 C.F.R. § 416.924(c). Lastly, a child is not disabled unless her impairment or impairments meet, medically equal, or are functionally equal in severity to an impairment in the listings. 20 C.F.R. § 416.924(d).

The two standards diverge at the third step of the analysis and with respect to the functional equivalency standard. Under the new rules, which became effective in January 2001, the SSA examines a child's functioning in six areas or domains to determine if the child is functionally equivalent to a listed impairment. The six areas or domains are new: acquiring and using

information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. 20 C.F.R. § 416.926a(b) & (g)-(l). The old functional areas, applicable to the ALJ's decision, were: motor functioning; personal; cognitive/communicative; concentration, persistence and pace; and social functioning. (A.R. at 27.) Although the domains are different, both the old and new regulations required a showing of a marked limitations in two relevant areas for a claimant to be found functionally equivalent to a listing. *See* 20 C.F.R. § 416.926a(b)(2) (1999); 20 C.F.R. § 416.926a(d) (2001).

Both sides recognize that regulations dictate which standard should apply here, though they differ as to the application of the relevant provision, which explains:

> When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules. We will also apply them to the entire period at issue for claims that are pending at any stage of our administrative review process, including claims that are pending administrative review after remand from a Federal court. With respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review of the Commissioner's final decision would be made in accordance with the rules in effect at the time of the final decision.

65 Fed. Reg. at 54,751. The critical question to address here is: when was the SSA final decision issued? The Seventh Circuit has held that when the Appeals Council denies a request for review, the ALJ's decision will constitute the final decision in the case. *Scott v. Barnhart*, 297 F.3d 589, 593 n.4 (7th Cir. 2002) ("because the SSA's Appeals Council denied [plaintiff's] request for review, the ALJ's findings constitute the final decision of the Commissioner in this case"); *see also* 20 C.F.R. § 416.1481. Because the Appeals Council denied review in this case, the court will apply the disability standard in place at the time of the ALJ's decision.

As the court will explain below, the court finds that even after applying the old standard to Plaintiff's claim, the matter must be remanded back to the SSA for further review. Notably, according to the SSA's regulation, once the matter is remanded the new disability standard will

apply to Plaintiff's claim. *See* 65 Fed. Reg. at 54,751.

## DISCUSSION

The court is authorized pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final decision. 42 U.S.C. § 405(g); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Furthermore, this court affords the ALJ's determination of credibility "special deference" and will only reverse this finding if the plaintiff can show that it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The court will not, however, uncritically "rubber stamp" the ALJ's decision. *Clifford*, 227 F.3d at 869. The Seventh Circuit directs a court to review the record critically to ensure that the ALJ did not "play doctor" by making "independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). The court must also exercise care in reviewing the ALJ's decision to insure that the ALJ "articulate[d] some legitimate reason for his decision" and built an "accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. In addition, the Seventh Circuit stated that conclusions of law are not entitled to deference and an error of law must result in reversal. *Schaefer on behalf of Schaefer v. Heckler*, 792 F.2d 81, 84 (7th Cir. 1986). With these standards in mind the court now addresses the parties' motions.

Plaintiff argues that the ALJ made three errors that require reversal of his decision denying Plaintiff SSI benefits. Plaintiff argues, first, that the ALJ did not explain why Plaintiff failed to meet or medically equal the childhood disability Listing 112.08, which describes personality disorders. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §112.08. Plaintiff argues, next, that the ALJ applied the incorrect legal standard when he found that Plaintiff did not have a marked limitation in the area

of concentration, persistence and pace because he was not diagnosed with an attention deficit disorder. Lastly, Plaintiff argues that the ALJ did not sufficiently explain why Plaintiff failed to functionally equal the childhood disability listings. Not surprisingly, Defendant contends that the ALJ's decision was supported by substantial evidence and that this court must therefore affirm the decision denying Plaintiff benefits. The court addresses Plaintiff's arguments in turn.

First, Plaintiff argues that the ALJ erred by not providing any reasoning for his conclusion that Plaintiff did not meet or medically equal Listing 112.08, the listing for personality disorders. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.08. In fact, Plaintiff notes that the ALJ did not even make reference to Listing 112.08 in his decision denying benefits, but instead generally stated "[t]he claimant does not have an impairment or combination of impairments listed in, or medically or functionally equal to one listed in, Appendix 1 to Subpart P, Regulations No.4." (A.R. at 27.)

The court notes that Listing 112.08, like many of the listed impairments, provides a list of factors that a claimant must prove to establish that he or she is disabled for the purposes of SSI benefits. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.08. Specifically, Listing 112.08 is divided into two categories: A and B. For the claimant to meet the listing the claimant must meet one of the requirements in category A and two of the requirements in category B. *Id.* Under Listing 112.08, claimant must demonstrate:

> A. Deeply ingrained, maladaptive patterns of behavior, associated with one of the following:
> 1. Seclusiveness or autistic thinking; or
> 2. Pathologically inappropriate suspiciousness or hostility; or
> 3. Oddities of thought, perception, speech, and behavior; or
> 4. Persistent disturbances of mood or affect; or
> 5. Pathological dependence, passivity, or aggressiveness; or
> 6. Intense and unstable interpersonal relationships and impulsive and exploitative behavior; or
> 7. Pathological perfectionism and inflexibility;
> AND
> B. For Children (age 3 to attainment of age 18), resulting in at least two the following:
> a. Marked impairment in age-appropriate cognitive/communicative function . . .
> b. Marked impairment in age appropriate social functioning . . .
> c. Marked impairment in age-appropriate personal functioning . . .

d. Marked difficulties in maintaining concentration, persistence, or pace.

*Id.*; *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.02.B.2. Plaintiff argues that the ALJ's failure

to specifically address the 112.08 listing requires reversal. Although Defendant acknowledges that

Plaintiff raised Listing 112.08 before the ALJ and that the ALJ did not specifically mention the listing

in his decision, Defendant argues that reversal or remand is not required because the ALJ relied

on the expert testimony of Dr. Blackman and Dr. Fischer.

Plaintiff's argument relies chiefly on *Scott v. Barnhart*, 297 F.3d 589 (7th Cir. 2002), in which

the claimant was a four-year-old boy allegedly functioning in the mildly retarded range, evidenced,

according to claimant's mother, by his lagging language skills and short attention span. *Id.* at 590-

91. In *Scott*, the Seventh Circuit remanded the claimant's case back to the agency because the

ALJ failed to fully address the medical evidence or discuss that evidence in light of a specific listing.

*Id.* at 596. The court stated that "[w]e have repeatedly admonished ALJs to 'sufficiently articulate

[their] assessment of the evidence to assure us that [they] considered the important evidence and

. . . to enable us to trace the path of [their] reasoning.'" *Id.* at 595, quoting *Hickman v. Apfel*, 187

F.3d 683, 689 (7th Cir. 1999). The Seventh Circuit added that the ALJ failed to provide a

"meaningful discussion" of conflicting medical opinions pertaining to claimant's condition, and

instead merely stated his conclusions and cited certain exhibit numbers. *Id.* at 596. In addition,

similar to Plaintiff's case, the ALJ in *Scott* failed to address a critical listing. The Seventh Circuit

found that:

> the ALJ did not discuss or even reference Listing 112.05--the section critical to
> [claimant's] case. Without any further reference to the listings, the opinion merely
> states that: The claimant's impairments do not meet or equal in severity any Listed
> Impairment found in Appendix 1 to Subpart B of Regulation No. 4 of the Social
> Security Act, as amended.

*Id.* at 595 (internal quotations omitted). The Seventh Circuit added that the ALJ failed to provide

a "meaningful discussion" of conflicting medical opinions pertaining to claimant's condition, and

instead merely stated his conclusions and cited certain exhibit numbers. (*Id.* at 596.)

Defendant argues that the court's rationale in *Scott* does not require Plaintiff's case be remanded back to the agency. Although Defendant acknowledges that the ALJ failed to cite any listing, including Listing 112.08, Defendant argues that Plaintiff relied on the two medical experts (Blackman and Fischer), who addressed Plaintiff's cognitive and behavioral problems. Defendant notes that in *Anderson v. Bowen*, 868 F.2d 921, 928 (7th Cir. 1989), the Seventh Circuit refused to remand or reverse the ALJ's denial of benefits on the basis that the ALJ neglected to address whether the claimant had vascular congestion, when two medical experts affirmatively stated that claimant did not suffer from this condition. In *Anderson*, however, the ALJ failed to address a condition rather than an entire Listing. In addition, in making this argument the Defendant attempts to focus the court's attention on the record and the testimony of the two medical experts, rather than on the specific rationale of the ALJ. The court notes, however, that in a recent Seventh Circuit opinion the court instructed reviewing courts to insure that the ALJ has rationally articulated his or her decision, regardless of whether there is evidence to support that decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.")

The court recognizes that much of the medical evidence relied on by the ALJ, the expert testimony in particular, tends to demonstrate that Plaintiff is not entitled to SSI benefits. The court notes, however, that it was undisputed that Plaintiff suffered from a conduct disorder. (A.R. at 362, 430.) Plaintiff claims that this conduct disorder satisfies Category A of Listing 112.08 because the disorder resulted in "persistent disturbances of mood or affect" and "intense and unstable interpersonal relationships and impulsive and exploitive behavior." The court notes that Plaintiff may have difficulty proving that he meets Listing 112.08; it might well be a simple task for the ALJ

29

to discuss the listing in connection with his denial of benefits. The court, nevertheless, is unwilling to find that the ALJ's finding is supported by substantial evidence when he did not address the evidence in light of the relevant listing. As noted, the ALJ is required to "build an 'accurate and logical bridge from the evidence to [his] conclusion' to enable a meaningful review." *Scott*, 297 F.3d at 595, quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). As in *Scott*, this court will remand this case back to the agency for further proceedings. As a result the court grants Plaintiff's summary judgment motion and denies Defendant's motion.

The court notes, moreover, that in finding that Plaintiff did not have a marked limitation in the area of concentration, persistence, or pace, the ALJ stated: "Claimant has a problem with impulsivity; however, according to Dr. Fischer, there is no evidence of attention deficit hyperactivity disorder ("ADHD"). Therefore, his concentration, persistence and pace are less than markedly impairment [sic]." (A.R. at 27.) The ALJ's conclusion leaves the impression that a child could not be markedly impaired in this area *unless* he or she is diagnosed with ADHD, which is not the standard under the Social Security Act. Instead, an ALJ is instructed to focus on the claimant's performance at school. According to the regulations,

> the intent of the functional criterion . . . of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, is to identify the child who cannot adequately function in primary school because of a mental impairment. Although grades and the need for special education placement are relevant factors which must be considered in reaching a decision . . . they are not conclusive.

20 C.F.R. Part 404, Subpt. P, App.1, § 112.00C.3; *See also* 20 C.F.R. Part 404, Subpt. P, App.1, § 112.00C.4 (regulations explain that functional criteria for children ages twelve to eighteen parallel those for primary school children). Whether the ALJ correctly determined Plaintiff's limitation in this area is highly relevant to Plaintiff's claim. If the ALJ had decided that Plaintiff had a marked limitation in the area of concentration, persistence, or pace, this finding along with his previous finding that Plaintiff suffered a marked limitation in social functioning, would have provided a basis

for the ALJ to award SSI benefits under the then-applicable functional equivalence standard. 20 C.F.R. § 416.926a(b)(2) (1999).

Defendant argues that the ALJ relied on all of Fischer's testimony, in which he considered a variety of factors in concluding that Plaintiff was not markedly impaired in the area of concentration, persistence and pace, including Plaintiff's performance at school. While Defendant is correct in stating that Fischer examined a great deal of information in forming his opinion about Plaintiff, the ALJ appears to have concluded that a finding of ADHD is required for a Plaintiff to be markedly impaired in this area.

Lastly, the court notes that Plaintiff argues that he is functionally disabled because he has marked limitations in two domains under the new regulations, which became effective January 2, 2001. As explained above, however, the new regulations were not applicable to Plaintiff's claim at the time of the ALJ decision. Thus, the court overrules Plaintiff's objection on this basis.

## CONCLUSION

For the reasons explained here, the court grants Plaintiff's motion for summary judgment (14-1), denies Defendant's motion for summary judgment (17-1) and remands this case to the agency for further proceedings.

ENTER:

Dated: September 30, 2003

REBECCA R. PALLMEYER
United States District Judge